Judith **CLARK**, Jennifer Dohrn, Dana Biberman, Natalee Rosenstein, Franklin Apfel, Eve Rosahn, Jane Spielman, and Judy Greenberg, Plaintiffs,

v.

**UNITED STATES** of America; L. Patrick Gray, Individually and as former Acting Director of the Federal Bureau of Investigation; W. Mark Felt, Individually and as former Assistant Director of the Federal Bureau of Investigation; Edward S. Miller, Individually and as former Assistant Director of the Federal Bureau of Investigation; John J. Kearney, Individually and as former Special Agent of the Federal Bureau of Investigation; J. Wallace Laprade, Individually and as former Assistant Director of the Federal Bureau of Investigation; William Webster, Individually and as Director of the Federal Bureau of Investigation; Federal Bureau of Investigation; John Does, whose names are fictitious being presently unknown to plaintiffs at this time, Individually and as former and current agents and employees of the Federal Bureau of Investigation; John Mitchell, Individually and as former Attorney General of the United States; Griffin Bell, Individually and as Attorney General of the United States; Department of Justice; William F. Bolger, Individually and as Postmaster General of the United States; United States Postal Service; New York Telephone Company; Richard M. Nixon, Individually and former President of the United States, Defendants.

No. 78 Civ. 2244(MEL).

United States District Court,
S. D. New York.

Nov. 19, 1979.

On Motion for Certification for Interlocutory Appeal Jan. 8, 1980.

Susan V. Tipograph, Susan Y. Kunstler, Derek Edley, New York City, for plaintiffs.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City, for defendants United States of America, the Federal Bureau of Investigation, the Department of Justice, the United States Postal Service, Richard Nixon, John Mitchell, Griffin Bell, William Bolger and William Webster; William J. Hibsher, Asst. U. S. Atty., New York City, of counsel.

George E. Ashley, New York City, for defendant New York Telephone Co.; Frank R. Natoli, Michael F. X. Manning, New York City, of counsel.

Leonard, Cohen, Gettings & Sher, Washington, D. C., for defendant W. Mark Felt; Brian P. Gettings, Washington, D. C., of counsel.

Diuguid, Siegel & Kennelly, Washington, D. C., for defendant Edward S. Miller; Thomas A. Kennelly, Washington, D. C., of counsel.

Rogers, Hoge & Hills, New York City, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for defendant L. Patrick Gray, III; James B. Swire, Robert B. Levin, Baltimore, Md., of counsel.

Windels, Marx, Davies & Ives, New York City, for defendant John J. Kearney; J. Daniel Mahoney, J. Dennis McGrath, New York City, of counsel.

LASKER, District Judge.

This suit is a residue of the resistance to the Vietnam war.

Plaintiffs, eight "former and present members of the 'New Left'," (Complaint ¶ 4), filed this action against the United States, several federal governmental agencies, various federal governmental officials [1] and the New York Telephone Company (NYT) alleging break-ins and burglaries of plaintiffs' homes and offices, physical intimidation and harassment, wiretaps, mail openings, and other forms of illegal surveillance. They seek damages and injunctive relief for alleged past and continuing violations of their rights secured by the Constitution, federal and state statutes, and the common law.

A number of motions are pending. Former President Richard Nixon moves to dismiss the complaint on the grounds that he is immune from liability; former Attorney General John Mitchell moves to dismiss the complaint against him on the grounds it is time barred; former Acting Director of the Federal Bureau of Investigation (FBI) L. Patrick Gray moves to dismiss the complaint against him on the grounds that he is not subject to the jurisdiction of New York courts; NYT moves to dismiss the complaint against it on the grounds that the state action requirement for jurisdiction over the civil rights claims against it is not satisfied; and the United States and the federal agencies move to dismiss on the grounds that the Court lacks jurisdiction over the claims against them because plaintiffs failed to exhaust their administrative remedies as required under the Federal Tort Claims Act, and because the agencies cannot be sued in their own names. All the defendants move to dismiss on the grounds

that the complaint is not sufficiently specific to state a claim of constitutional or civil rights violations. Finally, Gray, Mark Felt and Edward Miller move to stay the action as to them pending the conclusion of the criminal proceedings concerning the same allegations now pending in the United States District Court for the District of Columbia.

## I. Nixon Immunity

Nixon moves to dismiss the complaint against him on the grounds that the doctrine of separation of powers makes him absolutely immune from suits for damages resulting from action he took while President. Citing a number of district and circuit court cases that have held him immune in actions seeking judicial review of his discretionary actions taken as President, as opposed to purely ministerial actions,[2] he argues that the development of the surveillance program alleged to have been directed against the plaintiffs was a discretionary action and is therefore not subject to judicial review.

However, each of the lower court cases cited by Nixon was decided prior to the Supreme Court decision in *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), which, together with *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), controls the outcome of the immunity question here.

In *Scheuer*, the Supreme Court held that the governor of Ohio and other officials of the executive branch of that state's government enjoyed only a qualified immunity from 42 U.S.C. § 1983 liability in a suit brought by the representatives of three students killed during the Kent State University disorders. 416 U.S. at 247, 94 S.Ct. 1683.

In *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Court addressed the issue whether the Secretary

---

1. Each of the officials sued were named in their official and individual capacities.

2. *Bohmer v. Nixon*, No. 75–4–T (S.D.Cal. June 16, 1976); *Davis v. Nixon*, No. 73–1520 (C.D.

Cal. June 18, 1974); *Fonda v. Nixon*, No. 73–2442 (C.D.Cal. May 23, 1974); *Reese v. Nixon*, 347 F.Supp. 314 (C.D.Cal.1972), *aff'd in part*, No. 72–3070 (9th Cir. May 3, 1974).

of Agriculture and other federal officials of that Department were entitled to absolute immunity in a suit alleging that they instituted an investigation and administrative proceeding against Economou to retaliate for his criticism of the Department. The Court held that

> "in a suit for damages arising from unconstitutional action, federal executive officials exercising discretion are entitled only to the qualified immunity specified in *Scheuer*, subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business." [3]

*Id.* at 507, 98 S.Ct. at 2911 (footnote omitted).

In reaching this conclusion, the Court rejected the government's position that the federal officials sued in *Butz* were absolutely immune. The Court stated:

> ". . . in the absence of congressional direction to the contrary, there is no basis for according to federal officials a higher degree of immunity from liability when sued for a constitutional infringement as authorized by *Bivens* than is accorded state officials when sued for the identical violation under § 1983. . . . The pressures and uncertainties facing decisionmakers in state government are little if at all different from those affecting federal officials. We see no sense in holding a state governor liable but immunizing the head of a federal department; in holding the administrator of a federal hospital immune where the superintendent of a state hospital would be liable; in protecting the warden of a federal prison where the warden of a state prison would be vulnerable; or in distinguishing between state and federal police participating in the same investigation. Surely, *federal* officials should enjoy no greater zone of protection when they violate *federal* constitutional rules than do *state* officers. . . . To create a system in which the Bill of Rights monitors more

closely the conduct of state officials than it does that of federal officials is to stand the constitutional design on its head."

*Id.* 438 U.S. at 500–01, 504, 98 S.Ct. at 2909–2910, 2911 (emphasis in original) (footnote omitted). That state and federal officials should be treated alike for purposes of immunity is not new to American jurisprudence. Chief Justice Marshall posited the same principle in *United States v. Burr*, 25 Fed.Cas. 30, 34 (C.D.D.Va.1807) (No. 14,-692d), when discussing whether a *subpoena duces tecum* could issue to the President. In rejecting the argument that the president was not subject to process because the king was not subject to it, Marshall stated

> "In this respect the first magistrate of the Union may more properly be likened to the first magistrate of a state [who] might be served with a subpoena ad testificandum."

*Id.* at 34.

■ Considering together the *Scheuer* holding that the highest official of the state is only qualifiedly immune from suit, and the *Butz* ruling that state and federal officials are to be treated alike for purposes of immunity, it follows necessarily that the highest official of the United States ordinarily enjoys a qualified immunity only.

■ However, *Butz* recognized an exception to its holding that executive officials were entitled to a qualified immunity, available in those situations in which an "absolute immunity is essential for the conduct of the public business." 438 U.S. at 507, 98 S.Ct. at 2911 (footnote omitted). It is not clear whether this language refers only to the situation present in *Butz*, in which the jobs of the officials sued were functionally equivalent to those of judges and prosecutors, or whether it was intended to apply also to a situation, not before the *Butz* Court, in which the action taken by the official was executive in nature, but nevertheless merited the protection of absolute immunity because of the unusual circumstances prompting it.

---

**3.** The Court held that the agency officials whose jobs were functionally equivalent to judges and prosecutors in administrative proceedings were entitled to the absolute immunity enjoyed by judges and prosecutors. *Id.* at 514, 516–17, 98 S.Ct. 2894.

Whichever may be the proper construction, the conclusion that Nixon is not absolutely immune in this case is the same. Nixon does not argue that developing the alleged surveillance program was an exercise of a judicial or prosecutorial function of his former office, nor that it was "essential to the conduct of the public business."

A further consideration by the *Butz* Court supports the ruling that Nixon is only qualifiedly immune here. The *Butz* Court reasoned that

> "the cause of action recognized in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 [91 S.Ct. 1999, 29 L.Ed.2d 619] (1971), would . . . be 'drained of meaning' if federal officials were entitled to absolute immunity for their constitutional transgressions. *Cf. Scheuer v. Rhodes*, 416 U.S., at 248 [94 S.Ct. [1683] at 1692]."

438 U.S. at 501, 98 S.Ct. at 2908. It was implicit in the *Bivens* ruling, according to the *Butz* Court, that federal officials ought not be absolutely immune from damage suits, because

> "If, as the Government argues, all officials exercising discretion were exempt from personal liability, a suit under the Constitution could provide no redress to the injured citizen, nor would it in any degree deter federal officials from committing constitutional wrongs. Moreover, no compensation would be available from the Government, for the Tort Claims Act prohibits recovery for injuries stemming from discretionary acts, even when that discretion has been abused."

*Id.* at 505, 98 S.Ct. at 2910 (footnote omitted).

Furthermore, the *Butz* Court reasoned, there is no basis on which to distinguish among federal officials because of their rank or office.

> "It makes little sense to hold that a Government agent is liable for warrantless and forcible entry into a citizen's house in pursuit of evidence, but that an official of higher rank who actually orders such a burglary is immune simply because of his greater authority. Indeed, the greater power of such officials affords a greater potential for a regime of lawless conduct. Extensive Government operations offer opportunities for unconstitutional action on a massive scale. In situations of abuse, an action for damages against the responsible official can be an important means of vindicating constitutional guarantees."

*Id.* at 505–06, 98 S.Ct. at 2910. Nor has Nixon in fact shown any reason why the elevated rank of his office distinguishes his case from that of other high level federal officials such as those sued in *Butz*. *Halperin v. Kissinger*, 196 U.S.App.D.C. 285 at 303–304, 606 F.2d 1192, 1210–11 (D.C.Cir. 1979) ("In order to accept defendant Nixon's argument that he, as a former President, is absolutely immune from this suit, we would have to hold that his status as President sets him apart from the other high Executive officials named as defendants to this action. . . . we are unable to make that distinction").[4]

■ For the reasons stated, Nixon's motion to dismiss is denied.[5]

---

4. In support of his argument that any person who holds or has held the Office of President should ·be absolutely immune, Nixon places great stress on the claim that any other policy will prevent effective discharge of presidential duties. This issue, which is certainly of prime social importance, is treated at some length in *Halperin v. Kissinger* referred to in the text above. We agree with the analysis of the *Halperin* Court on the policy question posed. However, in view of what appears to us to be clear rulings by the Supreme Court in *Scheuer* and *Butz* that no such absolute immunity is appropriate, we have found it unnecessary to discuss the policy question.

5. It remains true, however, that Nixon is entitled to the qualified immunity accorded the officials sued in *Butz*, as articulated by the Court in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Accordingly, Nixon is subject to liability only

> "if he knew or reasonably should have known that the action he took . . . would violate the constitutional rights of the [person] affected, or if ·he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury."

*Id.* at 322, 95 S.Ct. at 1001. Thus, to prevail, plaintiffs must prove at trial that Nixon either

## II. Mitchell's Statute of Limitations Defense

Mitchell moves to dismiss the complaint against him on the grounds that it is time-barred. He argues that because he left office on March 1, 1972, and this action was commenced in May 1978, more than six years later, all of the possibly applicable limitation periods had expired before this suit was brought. Plaintiffs contend that their claims are timely because (1) the causes of action against Mitchell did not accrue until March 1977 (the date of the indictment of Kearney and Gray) and (2) the running of the statute of limitations was tolled until the same date.

### A. The Applicable Period

Mitchell suggests several statute of limitations periods that may apply to the causes of action asserted against him, ranging from two to six years.[6] This action was filed more than six years after Mitchell left office, and plaintiffs have not alleged that Mitchell continued his wrongful conduct after leaving office. Consequently, if any of the suggested periods apply, the claims against Mitchell are barred, unless the running of the periods has been tolled or did not begin until 1977, as plaintiffs argue. If the running of the statutes was tolled or the cause of action did not accrue until March 1977, then the claims are timely, regardless of which period applies. Consequently, the determinative decisions concern accrual and tolling, and it is unnecessary to decide which period applies.

knew or should have known that his actions were unlawful, or that he acted with malicious intent. Heeding the caveat of the *Butz* Court that "[u]nless the complaint states a compensable claim for relief under the Federal Constitution, it should not survive a motion to dismiss," 438 U.S. at 508, 98 S.Ct. at 2911, we note that plaintiffs plead the criteria required by *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975) in alleging that the acts done by all the defendants were "done willfully, intentionally, maliciously and with a knowing, reckless and negligent disregard of the plaintiffs' rights." Complaint ¶ 51.

**6.** As to the cause of action based on alleged violations of the Wiretap Statute, 18 U.S.C. § 2520, Mitchell contends that since no statute of limitations period is provided by the statute

### B. Accrual

Plaintiffs assert that the causes of action against Mitchell did not accrue, and the statute of limitations did not begin to run, until at least March 1977. Until that time, plaintiffs argue they were not aware, and could not have been expected to be aware, that their rights had been violated. Urging application of the federal "discovery rule," plaintiffs contend that their causes accrued when they discovered, or should have discovered, that their rights were violated, that is, when the covert surveillance program was publicized by the indictments.

The discovery rule was applied by the Supreme Court in *Urie v. Thompson*, 337 U.S. 163, 170, 69 S.Ct. 1018, 1025, 93 L.Ed. 1282 (1949), in which the Court held that the plaintiff's cause of action for having contracted lung disease from breathing silica dust while in the defendant's employ accrued when the symptoms of that disease became manifest. The Court noted that the

"traditional purposes of statutes of limitations . . . require the assertion of claims within a specified period of time after notice of the invasion of legal rights."

The rule has been applied by the lower federal courts in cases brought under the Federal Tort Claims Act for alleged medical malpractice on the part of doctors employed by federally operated hospitals, *Ciccarone v.*

creating the right asserted, the Court must apply either an analogous state period (here, New York C.P.L.R. § 214(2) three-year period for causes of action based upon a statute) or an analogous federal period if the interests in federal uniformity are sufficiently pressing (here, the two-year period of the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*).

As to the *Bivens* causes of action, Mitchell argues for the applicability of either the three-year period of C.P.L.R. § 214(2), which governs statutory claims, because of the similarity between *Bivens* claims and claims under the Civil Rights Act, 42 U.S.C. §§ 1981 *et seq.*, which are governed by C.P.L.R. § 214(2), or the six-year residual period provided by C.P.L.R. § 213(1). Plaintiffs have not addressed the issue of which period applies.

*United States,* 486 F.2d 253, 256 (3d Cir. 1973); *Toal v. United States,* 438 F.2d 222, 225 (2d Cir. 1971); *see Kossick v. United States,* 330 F.2d 933, 936 (2d Cir.), *cert. denied,* 379 U.S. 837, 85 S.Ct. 73, 13 L.Ed.2d 44 (1964), and for negligence on the part of government employees in administering safety regulations pertaining to the manufacture of a polio vaccine which resulted in the plaintiff's contracting polio, *Hammond v. United States,* 388 F.Supp. 928, 932 (E.D. N.Y.1975). In *In re Franklin National Bank Securities Litigation,* 445 F.Supp. 723, 735–36 (E.D.N.Y.), Judge Platt applied the discovery rule to determine when the claim of negligence on the part of the United States in conducting the bank examinations and other regulatory functions accrued. In that case the claimants argued that the causes of action against the United States were timely under the Federal Tort Claims Act because they were brought within two years after Congressional hearings that put them on notice of the government's wrongful conduct. The Court held that whether the alleged wrong should have been discovered earlier raised a question of fact, and refused to dismiss the claims.

▪ Mitchell argues that the federal discovery rule applies only if federal law controls the statute of limitations period to be applied, and that if the statute of limitations question is controlled by New York law, the hostility with which New York courts view the discovery rule would result in a finding that the causes of action against him accrued at the time the wrongs occurred. *See Schwartz v. Heyden Newport Chemical Corp.,* 12 N.Y.2d 212, 237 N.Y.S.2d 714, 188 N.E.2d 142, *modified,* 12 N.Y.2d 1073, 239 N.Y.S.2d 896, 190 N.E.2d 252, *cert. denied,* 374 U.S. 808, 83 S.Ct. 1697, 10 L.Ed.2d 1032 (1963); *Schmidt v. Merchants Despatch Trans. Co.,* 270 N.Y. 287, 200 N.E. 824 (1936). However, it is unnecessary to resolve the question of which statute of limitations applies. Even if the state

statute of limitations applied, federal law would control the accrual issue because determination of when a cause of action accrues involves the interpretation of federal law. *Rawlings v. Ray,* 312 U.S. 96, 98, 61 S.Ct. 473, 85 L.Ed. 605 (1941); 2 Moore's Federal Practice ¶ 3.07[2], at 3–62 (2d ed. 1978).

▪ The issue, then, is whether the discovery rule applies to the claims asserted here. The Court of Appeals for the Second Circuit addressed this issue in a *dicta* footnote in *Birnbaum v. United States,* 588 F.2d 319, 335 n.31 (2d Cir. 1978), which involved claims for alleged CIA mail openings. There the court stated that the discovery rule was "a most unlikely rule in this type of case." The wrongs alleged here are similar to those in *Birnbaum.* Both cases involve covert government surveillance of individuals through allegedly illegal means. It appears, therefore, that this case is one of the "type" in which the discovery rule would be considered "unlikely" by the *Birnbaum* court. In view of this "unlikelihood" and the considerations which follow, we conclude that the discovery rule does not apply to this case, and plaintiffs' causes of action accrued at the time the wrongs were committed.[7]

Although not articulated by the *Birnbaum* court, the reason for this result is evident. In those cases in which the discovery rule is properly applicable, the wrong alleged is inherently impossible to ascertain at the time committed until the resulting injury becomes manifest. In *Urie,* for example, it was impossible for the plaintiff or anyone else to know at the time he first breathed the silica dust that he had been injured. Consequently, the cause of action for that wrong accrued at the time the injury was manifest.

Here, however, the wrongs alleged were capable, at least within the range of ordinary human knowledge, of being as-

---

7. Plaintiffs also contend in their memorandum in opposition that their claims against Mitchell allege a continuing wrong, and in such circumstances the statute of limitations does not begin to run until the wrongful conduct is terminated.

However, nowhere do plaintiffs allege that the wrongful conduct by Mitchell continued past his tenure in office. Therefore, this contention does not present a basis for denying Mitchell's motion to dismiss.

certained at the time they were committed. That is, whether or not they were actually known to the plaintiffs, they were knowable as a matter of human experience. If the plaintiffs did not know of the violations of their rights at the time they occurred the reason was not because of the nature of the wrongs suffered, but due to the covert nature in which the alleged surveillance program was carried out.

Consequently, the issue of the timeliness of plaintiffs' claims against Mitchell are less appropriately analyzed under the discovery accrual rule than under the fraudulent concealment doctrine, to which we now turn.

## C. Fraudulent Concealment

Plaintiffs' final basis for contending that their claims should not be time-barred is that the running of the statute of limitations was tolled because Mitchell concealed his alleged wrongful conduct, and plaintiffs had no knowledge of it until it was made public by the indictment of four of the other defendants. Mitchell replies that the running of the statute is tolled only by active concealment which plaintiffs must allege and prove.

 Under both federal and New York law the fraudulent concealment preserves otherwise time-barred claims. Under New York law, a defendant whose affirmative concealment, fraud, misrepresentations or deception induce a plaintiff to refrain from filing the action is estopped from asserting the statute of limitations defense. *Simcuski v. Saeli,* 44 N.Y.2d 442, 406 N.Y.S.2d 259, 262, 377 N.E.2d 713 (1978); *General Stencils, Inc. v. Chiappa,* 18 N.Y.2d 125, 272 N.Y.S.2d 337, 340, 219 N.E.2d 169 (1969). Similarly, under federal law a statute of

limitations is tolled by active concealment by the defendant and the inability of the plaintiff with due diligence to have discovered the alleged wrongs earlier. *Smith v. American President Lines, Ltd.,* 571 F.2d 102, 109 n.12 (2d Cir. 1978); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 460–61 (2d Cir. 1974); *Baker v. F & F Investment,* 420 F.2d 1191, 1198–99 (7th Cir.), *cert. denied,* 400 U.S. 821, 91 S.Ct. 40, 27 L.Ed.2d 49 (1970).

Mitchell contends that the doctrine does not apply in this case because, he claims, the complaint does not expressly allege that he actively concealed the alleged wrongs.[8] In relevant part, the complaint alleges that defendants "all participated in the programs of a secret police network" (¶ 31), and "[t]he full nature and extent of defendants' actions are at this time unknown . . . because the actions were carried out in a covert and illegal manner . . . ." (¶ 48).

 These two allegations are sufficient to satisfy plaintiffs' burden of pleading fraudulent concealment. Although the complaint does not allege specifically what Mitchell did to conceal the alleged wrongs, it does assert that Mitchell (as one of the defendants) participated in a program which was carried out secretly and that as a result of the convert nature of the program, plaintiffs did not know of the alleged wrongs. Taking the facts as pleaded in the complaint as true for the purposes of this motion, the statute of limitations was tolled by Mitchell's fraudulent concealment of the alleged wrongs until the plaintiffs knew of the alleged wrongs in March 1977 when the first indictment was filed, and the com-

---

**8.** Mitchell urges that this case presents the same situation as *Seigel v. United States,* No. 78 C 1912 (E.D.N.Y. March 20, 1979), in which Judge Platt dismissed a similar claim of illegal wiretapping brought against Mitchell because he found that it was time-barred. Judge Platt ruled that the fraudulent concealment toll was not available because the plaintiffs had not satisfied their burden of pleading the benefit of the toll. *Seigel* is distinguishable from this case, however, because Judge Platt found that the plaintiffs in *Seigel* had notice of the surveillance within months of its termination in early 1972. Slip op. at 6. Thus, the plaintiffs in *Seigel* did not satisfy the second requirement for application of the fraudulent concealment toll, i. e., that they did not know of the alleged wrongs during the concealment period. Here, however, plaintiffs claim, and Mitchell does not deny that they did not know of the surveillance until March 1977.

plaint filed fourteen months later was timely.[9]

 ■■■ However, Mitchell is entitled to the opportunity to prove that he did not actively conceal the alleged surveillance program, and that the claims against him are therefore time-barred. Accordingly, Mitchell's motion to dismiss is denied without prejudice to its renewal after completion of discovery on the subject of his alleged fraudulent concealment, which, upon his request, shall precede other discovery against him.[10]

### III. In Personam Jurisdiction over Gray

 Gray moves to dismiss the complaint against him for lack of jurisdiction over his person. Although Gray was served with process in Connecticut, plaintiffs contend that he is subject to this court's jurisdiction under the New York long arm statute. N.Y.Civ.Prac.Law § 302(a) (McKinney 1972 & Supp. 1979–1980).

 Plaintiffs rely specifically on §§ 302(a)(2) and (3)(i), which in relevant part provide for personal jurisdiction over a nondomiciliary who "in person or through an agent" commits a tortious act within the state, § 302(a)(2), or commits a tortious act outside the state having an effect in the state and regularly engages in persistent course of conduct in the state, § 302(a)(3)(i).

 ■■■ Plaintiffs contend that jurisdiction over Gray exists on any of four theories: first, that Gray himself committed tortious acts in New York, thus bringing him within the reach of § 302(a)(2); second, that the acts of the FBI agents in New York can be attributed to Gray for jurisdictional purposes because they were his co-conspirators and consequently his agents for these purposes, bringing Gray within § 302(a)(2); third, that Gray himself committed tortious activity outside of New York causing injury in New York and engaged in persistent conduct in New York (§ 302(a)(3)(i)); and fourth, that Gray committed tortious activity outside of New York and his agents (the

FBI agents in New York) engaged in persistent conduct in New York that can be attributed to him for these purposes. (§ 302(a)(3)(i)).

 Plaintiffs' first and third theories rely on Gray having engaged in some activity in New York. However, plaintiffs have not pleaded or otherwise shown any facts that indicate that Gray did anything in New York. The complaint alleges only that Gray "while present in the State of New York" authorized the illegal activity directed against plaintiffs (¶ 41), but it does not allege facts supporting this claim. Moreover, Gray has submitted an affidavit in which he states that he did not authorize or take part in any of the acts alleged, either in New York or outside the state. Since it is plaintiffs' burden to establish jurisdiction, and since plaintiffs here have not shown any facts to counter Gray's denial of his presence in New York, jurisdiction cannot be based on his own actions in New York.

 ■■■ The validity of plaintiffs' second and fourth theories depends on the merits of plaintiffs' contention that the acts of the FBI agents in New York should be attributed to Gray. The long arm statute provides for jurisdiction over persons who commit the enumerated acts either in person or through an agent. The agency relationship required to extend jurisdiction over a nondomiciliary based on the acts of his agent has been held not to be limited to traditional agency relationships. The acts of a co-conspirator in New York can serve to extend jurisdiction over nonresident co-conspirators. *Louis Marx & Co. v. Fuji Seiko Co., Ltd.,* 453 F.Supp. 385, 391 (S.D.N.Y. 1978); *American Broadcasting Co. v. Hernreich,* 40 A.D.2d 800, 338 N.Y.S.2d 146, 147 (1st Dept. 1972) (per curiam) (alternative holding); *see* McLaughlin, Practice Commentary to C.P.L.R. § 302, at 28–29 (McKinney Supp. 1979–1980). However, a plaintiff cannot bootstrap his allegation of jurisdiction through conclusory allegations.

---

**9.** We note that under similar circumstances, the same result was reached in *Smith v. Nixon,* 196 U.S.App.D.C. 276 at 283, 606 F.2d 1183, 1190 (D.C.Cir. 1979).

**10.** If Mitchell believes that plaintiffs knew of his actions before he left office, and are consequently not entitled to the toll, he is of course free to depose them to establish that the causes of action against him are time-barred.

Thus, "bland assertions on conspiracy or agency is insufficient to establish jurisdiction for purposes of section 302(a)(2)." *Lehigh Valley Indus., Inc. v. Birenbaum,* 527 F.2d 87, 93–94 (2d Cir. 1975); *Blackburn v. Goodwin,* No. 77 Civ. 3643, Slip op. at 15 (S.D.N.Y. September 18, 1978), *rev'd on other grounds,* 608 F.2d 919 (2d Cir. 1979); *Louis Marx & Co. v. Fuji Seiko Co., Ltd.,* 453 F.Supp. 385, 391 (S.D.N.Y.1978); *Socialist Workers Party v. Attorney General,* 375 F.Supp. 318, 322 (S.D.N.Y.1974); *Lamarr v. Klein,* 35 A.D.2d 248, 315 N.Y.S.2d 695 (1st Dept. 1970), *aff'd,* 30 N.Y.2d 757, 333 N.Y. S.2d 421, 284 N.E.2d 576 (1972) (per curiam).

In this case, plaintiffs allege that Gray "developed and formulated" the program of illegal surveillance (¶ 34), discussed the aims and implementation of the surveillance plan (¶ 35), "authorized his agents and employees, including but not limited to those in the New York FBI office, to commit illegal activities against the plaintiffs" (¶ 41), and was indicted for conspiring in the illegal activity alleged.

These allegations are not merely conclusory: rather, they state that Gray developed and authorized the program of illegal surveillance against plaintiffs in New York. Taking these facts as true, the FBI agents were his co-conspirators and his agents acting in New York for purposes of the long arm statute. This alleged activity in New York is sufficient [11] to bring Gray within C.P.L.R. § 302(a)(2) and (3)(i).[12]

Gray asserts in his supporting affidavit that he did none of the alleged acts. If this is true, he is not subject to New York personal jurisdiction. This question, however, is inextricably tied to the merits of the case, so that to decide the jurisdiction question is to decide the action. Such a decision is impossible to reach at this stage of the litigation. Accordingly, Gray's motion to dismiss is denied.

## IV. State Action by NYT

NYT moves to dismiss on the grounds that the Court lacks subject matter

11. Since we find that the allegations of the complaint, described above, are sufficient, we need not determine whether, as the plaintiffs contend, Gray's indictment in the District of Columbia, which charges that he conspired in the entries and searches of the homes of several of the plaintiffs in New York, constitutes further evidence which the court may consider in determining the validity of this complaint. In a case comparable to this one, Judge Owen decided to the contrary. *Clavir v. United States,* 76 Civ. 1071 (S.D.N.Y. May 25, 1979). We find some difficulty with the *Clavir* determination. While it is, of course, true that the indictment cannot constitute evidence against Gray in the criminal proceedings against him, it by no means follows that, in civil matters, the court is precluded from taking judicial notice of the fact that a Grand Jury has found that there is probable cause to believe that Gray committed the very acts, or at least some of them, that the plaintiffs allege that he did. Surely such material is at least as probative as matter alleged on information and belief, a practice permitted under both the C.P.L.R. and the Federal Rules of Civil Procedure.

12. Jurisdiction is available as to those causes of action alleging constitutional violations as well as those alleging torts. Gray contends that constitutional wrongs do not constitute torts or tortious activity within the meaning of C.P.L.R. § 302(a)(2) and (3). No cases have been brought to our attention or uncovered by our research that address this issue. He argues that *Birnbaum v. United States,* 588 F.2d 319, 327–28 (2d Cir. 1978), in which the court held that constitutional violations are not torts for purposes of the Federal Tort Claims Act, determines the result on this issue. However, *Birnbaum* dealt only with the question of what suits Congress intended to allow against the United States and does not control the question of jurisdiction over private suits against an individual. No similar restraints limit the interpretation to be given "torts" or "tortious activity" as used in the long arm statute. Rather, the long arm statute was designed to take advantage of the constitutional power of the courts under *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), to exercise jurisdiction over nondomiciliaries, and to broaden the available bases of jurisdiction. *See Legislative Studies and Reports to* C.P.L.R. § 302, at 95 (McKinney 1972). The constitutional violations alleged here appear sufficiently akin to tortious activity to warrant a holding that they fall within the reach of § 302(a)(2) and (3). To hold otherwise would result in the artificial ruling that the long arm statute permits plaintiffs to sue Gray for the alleged conduct under a tort theory of liability, but not under the theory that their constitutional rights had been violated.

jurisdiction because the complaint against it fails to allege acts taken under color of state law.[13]

Plaintiffs argue that the action by NYT constitutes state action because of the extent of state regulation of the installation of wiretaps and the state-awarded monopoly enjoyed by NYT.[14]

In *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), the Supreme Court held that extensive state regulation coupled with a state-awarded monopoly were insufficient to establish state action. In that case, the Court held that a householder was not entitled to notice and a hearing before her electricity was cut off because the cutoff by the electric company did not constitute state action despite a state-awarded monopoly and state regulation of the utility. The Court set the standard of state action in the circumstances as:

> "whether there is a sufficiently close nexus between the State and the challenged action of regulated entity so that the action of the latter may be fairly treated as that of the State itself."

*Id.* at 351, 95 S.Ct. at 453.

Plaintiffs contend that the required nexus is established in this case by what they term the "affirmative burden placed on the phone company" by section 250.15 of New York's Penal Law, which makes it a felony for a telephone company to fail to report wiretapping known to be illegal. It is argued that this statute makes NYT and the State "joint participants" in the surveillance activity alleged. The contention is not persuasive. Following the logic proposed by plaintiffs to its conclusion, whenever a criminal statute is passed, action in violation of that statute may be ascribed to the State for purposes of state action.

In any event, the plaintiffs have failed to establish the required nexus between the alleged wiretaps by NYT and the State; that is, they have failed to allege facts sufficient to show that the action taken by NYT constitutes state action, and, looking beyond the complaint, their reliance solely on the statutory scheme described above is insufficient. Accordingly, NYT's motion to dismiss the complaint against it for lack of jurisdiction is granted.

## V. Exhaustion of Administrative Remedies

■ The United States and the federal agencies move to dismiss the claims against them under the Federal Tort Claims Act because plaintiffs failed to allege that they complied with 28 U.S.C. § 2675(a) which requires that such claims first be filed with the appropriate federal agency and that relief be denied before an action is commenced. Subsequent to filing their complaint, plaintiffs have filed with the appropriate agencies.

The government is correct that the jurisdictional prerequisites to suit had not been met at the time of the filing of the complaint. However, at argument on the motion the government agreed with the court that in light of the fact that the plaintiffs had, by the time of argument, properly filed

---

13. The claims against NYT are for violation of 42 U.S.C. § 1983 which applies to those who act "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . ."

NYT also urged orally during a conference before the Court that the claims against it should be dismissed for the same reasons the claims against the Chesapeake and Potomac Telephone Co. were dismissed in *Smith v. Nixon*, 196 U.S.App.D.C. 276, 606 F.2d 1183 (D.C.Cir. 1979) and *Halperin v. Kissinger*, 424 F.Supp. 838 (D.D.C.1976), *rev'd on other grounds*, 196 U.S.App.D.C. 285, 606 F.2d 1192 (D.C.Cir. 1979). In both cases, the telephone company was held not to be liable for illegal surveillance activities allegedly carried on by government officials because of the limited nature of its involvement. While this might provide appropriate grounds for dismissal, NYT did not argue these grounds in its supporting memorandum, nor has NYT submitted any affidavits stating that it played a limited role in the surveillance program, or that it was assured that its actions were legal. Therefore, NYT's motion is not granted on these grounds.

14. Plaintiffs rely principally on cases decided before *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), which is controlling here, and which undermines their argument.

their claims, the procedural problem ought to be solved by regarding the amended complaint as having been filed as of six months from the filing by the plaintiffs of their administrative claims; and the government indicated its willingness to stipulate to that effect.

We appreciate the government's desire to maintain the integrity of the structure of the claims procedure contained in the Federal Tort Claims Act. That integrity has been preserved by requiring the plaintiffs to file with the agencies in accordance with the Act. In the circumstances, while the court agrees with the government's position as a matter of law, the motion to dismiss is denied as moot because the plaintiffs have now in fact filed their claims and the government has stipulated that it will accept the amended complaint as having been filed six months from the date of filing of claims.

### VI. Suits Against Federal Agencies

■ The federal agencies move to dismiss the claims against them on the grounds that they are not subject to suit in their own names. The agencies are correct as to the Federal Tort Claims Act causes of action. That statute authorizes suit against the United States only. 28 U.S.C. § 2674. Plaintiffs contend however, that *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which allowed a § 1983 suit to be brought against a state agency, should be extended to permit suit against federal agencies. However, by its terms § 1983 applies only in cases of persons acting under color of state law. There is no basis for its application to federal agencies.

### VII. Specificity

■ Each of the defendants moves to dismiss the complaint against him or it on the grounds that it is not sufficiently specific. The motions are denied except for the motions by former Attorney General

Griffin Bell, Postmaster General William Bolger and Director of the FBI William Webster, who move to dismiss the suit against them in their individual capacities only. As to the defendants other than Bell, Bolger and Webster, the complaint is sufficiently specific to apprise the defendants of the claims brought against them. Any further detail required to defend the action may be obtained through discovery.

The only references to defendants Bell, Bolger and Webster in the complaint are the allegations that "the actions of the defendants continue to this day" (¶ 5) and that present directors of the FBI and the Department of Justice "developed and formulated" "[t]he program of illegal actions directed against the plaintiffs" (¶ 34). No allegations more specific than these link the present officials to the alleged illegal activities that have occurred since they assumed office. These allegations fail to meet the standards of specificity as to charges of violations of constitutional rights set forth in *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir. 1977). The motions to dismiss the complaint against Bell, Bolger and Webster in their individual capacities is granted.[15]

### VIII. Stays of the Proceeding as to Gray, Felt and Miller

■ Gray, Felt and Miller move to stay the action with respect to them pending the completion of the criminal proceedings now pending against them in the United States District Court for the District of Columbia concerning some of the same allegations brought here. The motions are granted.

Defendants claim that it will strain their limited resources to defend this action simultaneously with the criminal action pending against them on substantially the same subject matter in the District of Columbia. More significantly, they point out that with regard to any discovery as to them in this case, they would very likely be required to invoke the Fifth Amendment during the pendency of the criminal pro-

---

**15.** These defendants have not moved to dismiss the complaint against them in their official capacities.

ceedings. Plaintiffs argue that denial of the stays will not prejudice defendants because their resources have been supplemented by public fund raising and a method of protecting the defendants during discovery could be devised to avoid forcing them to seek the protection of the Fifth Amendment privilege.

A determination of the issues crystalized by the parties' contentions would require a factual inquiry into the financial resources of defendants, which we are unwilling to undertake because it is unnecessary to the disposition of these motions. It is reasonable to assume that a denial of the stays would severely strain defendants' resources both financial and otherwise and would unnecessarily complicate the proceedings here by creating the likelihood that the defendants might invoke the Fifth Amendment privilege. Moreover, preparation for trial will not be unduly delayed if discovery against Gray, Felt and Miller is stayed because plaintiffs will be able to proceed with discovery as to all other defendants pending the termination of the criminal proceedings against Gray, Felt and Miller.

\* . \* \* \* \* \*

In sum, the motion to dismiss by Nixon is denied; the motion to dismiss by Mitchell is denied without prejudice to its renewal after discovery by plaintiffs on the issue of Mitchell's concealment of the wrongs alleged; the motion to dismiss by Gray is denied; the motion to dismiss by NYT is granted; the motions to dismiss by the federal agencies are granted; the motions to dismiss by the United States as is the motion to dismiss by Kearney are denied; the motions to dismiss by Bell, Bolger and Webster in their individual capacities are granted; and the motions for stays by Gray, Felt and Miller are granted.

Any party wishing the court to enter an order as to the disposition of any motion may submit a proposed order on notice.

### On Motion To Certify For Interlocutory Appeal

■ In an opinion dated November 19, 1979, L. Patrick Gray's motion to dismiss for lack of personal jurisdiction was denied.

Gray now applies for certification of an interlocutory appeal of that decision pursuant to 28 U.S.C. § 1292(b), arguing that "there is substantial ground for difference of opinion" on the controlling question of law as to whether the Federal Bureau of Investigation (FBI) agents who allegedly executed the plan of illegal surveillance on plaintiffs in New York were acting as Gray's agents within the meaning of New York's long arm statute, N.Y.Civ.Prac.Law and Rules § 302(a) (McKinney 1972 & Supp. 1979–1980).

Gray contends first that the decision denying his motion is at odds with *Marsh v. Kitchen*, 480 F.2d 1270, 1273 (2d Cir. 1973). *Marsh* held that the acts of New York federal law enforcement officials were insufficient to confer New York long arm jurisdiction, based on agency, over federal law enforcement officials in Missouri. Although Gray made this argument in the memorandum supporting his motion to dismiss, our earlier opinion did not expressly address the citation because it seemed apparent that *Marsh*—which was based on the assumption that jurisdiction could not be based on the acts of agents under § 302(a) unless a traditional agency relationship existed, 480 F.2d at 1273—was no longer viable in light of the subsequent Second Circuit statement in *Galgay v. Bulletin Co.*, 504 F.2d 1062, 1065 (2d Cir. 1974), that

> "a formal agency relationship is not necessary to impute activity against the defendant where he is being sued by a third party."

Nevertheless, the opinion denying Gray's motion stated the same principle without reference to *Marsh*:

> "The agency relationship required to extend jurisdiction over a nondomiciliary based on the acts of his agent has been held not to be limited to traditional agency relationships." (p. 1096).

Given the subsequent undermining of the *Marsh* decision, there is no ground for difference of opinion as to whether that case mandates a decision contrary to the one reached on Gray's motion to dismiss.

Second, Gray argues that the cases which have abandoned the requirement of traditional agency relationship have done so only while requiring that the agent's activities benefit the principal economically, and that no economic benefit accrued to Gray from the activities of the FBI agents. While the cases cited by Gray happen to involve economic benefit occurring to a principal, the rule merely requires that the principal benefit: it is not necessary that the benefit be economic. *E. g., Louis Marx & Co. v. Fuji Seiko Co.,* 453 F.Supp. 385, 390 (S.D.N.Y.1978); *Eliah v. Ucatan Corp.,* 433 F.Supp. 309, 313 (W.D.N.Y.1977); *Arcata Graphics Corp. v. Murrays Jewelers & Distributors, Inc.,* 384 F.Supp. 469, 472 (W.D.N.Y.1974). Here, the reasonable implication to be drawn from the allegations as to the acts of the FBI agents in New York is that Gray benefited from them by realizing the goals of the conspiracy to conduct surveillance on plaintiffs.

Finally, Gray argues that § 1292(b) certification ought to be granted because our decision allegedly differs from two others in cases involving nearly identical allegations. *Clavir v. United States,* 76 Civ. 1071 (S.D. N.Y. September 29, 1978); *Blackburn v. Kearney,* 77 Civ. 3211 (S.D.N.Y. September 18, 1978), *rev'd on other grounds sub nom. Blackburn v. Goodwin,* 608 F.2d 919 (2d Cir. 1979).

In *Clavir,* Judge Owen held that allegations of the complaint were not sufficiently specific to state a claim. Since that decision did not address the jurisdiction question presently presented, *Clavir* does not establish a difference of opinion which supports § 1292(b) certification.

In *Blackburn,* Judge Haight held that the plaintiff's allegations of conspiracy necessary to establish the agency relationship under the long arm statute were not sufficiently specific. Thus, the only difference between *Blackburn* and our earlier opinion relates to the degree of specificity necessary to allege an agency relationship under the long arm statute. Since that difference does not go to the question sought to be certified, that is, whether the FBI agents were acting as Gray's agents for purposes of long arm jurisdiction, *Blackburn* does not establish a difference of opinion on the issue sought to be certified.

Accordingly, the application for certification is denied.

It is so ordered.