## CIRCUIT COURT OF WARREN COUNTY

North Fork Shenandoah, Inc.

    v.

William Bunning et al.

September 18, 1986

Case No. (Law) 7157

By JUDGE HENRY H. WHITING

The Court must decide whether certain of the non-resident defendants are subject to service of process in Virginia.

The plaintiff, hereafter North Fork, had in its employ one William Bunning known to David Broderick, an employee of the defendant, hereafter Vacation, a California corporation, as a salesman and sales manager of vacation properties. Both North Fork and Vacation were engaged in the sale of vacation properties, and Vacation desired to employ a large number of salesmen to market some properties it proposed to develop in the Mid-west. Broderick's first contact for Vacation was a telephone call he made to Bunning in Virginia in January, 1984, seeking to hire him for Vacation, and the second contact was by a letter written in early February to Bunning (Tr., 19). Apparently for a period of about a month Mr. Bunning would not give a commitment but Broderick testified that:

In fact, [he] advised us on or about March 14th that beginning the next -- the following week, officially March 19th, that he was going to join the firm, give notice to [North Fork] and join our firm. That's the first time that Mr. Bunning told me that he was going to join the company. (Tr., 20.)

Prior to March 14, 1984, Bunning solicited several other North Fork salesmen to join him at a recruiting meeting to be conducted by Vacation on that day in Illinois and advanced their air fare and hotel bills for the meeting. Although there was no prior expressed agreement proven that Vacation would reimburse Bunning for those advances prior to that recruitment meeting, when Bunning told Vacation he was leaving North Fork, Vacation agreed to reimburse him for not only his out-of-pocket expenses but also the air fare and hotel bills for others which Bunning had advanced. One of the salesmen (Dan Browning) solicited by Bunning, said in his affidavit that: *"They* would get [his wife] a ticket also."* (Emphasis added.) I infer "they" to be Vacation and Bunning and there to have been a prior agreement to reimburse Bunning for the air fare and hotel costs advanced to other salesmen. The depositions show that Vacation, through Broderick, initiated a number of telephone calls to Virginia and wrote a number of letters to Virginia, as well as responding to telephone calls from Virginia, in pursuance to its plan to get Bunning· to join its mid-western operation and to have Bunning solicit other salesmen to join him in the proposed mid-western sales activities.

The Court must decide whether this California corporation has subjected itself to the "single act" Virginia long-arm statute in an alleged tortious interference with a contract seeking to entice one of the plaintiff's employees to leave its employ and induce other plaintiff's employees to join him in the employ of the defendant.

We must first determine whether the Virginia statute subjects Vacation to its jurisdiction. North Fork contends that if Vacation or its agent transacted any business in Virginia or caused tortious injury by an act or omission in Virginia under the provision of Virginia Code Section 8.01-328.1(A)(1), (3) it can be required to answer this action for tortious interference with its contract with Bunning.

The cases are in confusion as to whether the injury must have resulted from the act of the defendant or his agent while the defendant or his agent was *physically present in the state.* A careful study of the statute suggests that this is necessary, otherwise there would have been no reason to enact the following section, Virginia Code § 8.01-323.1(A)(4), providing for jurisdiction where a defendant has caused "tortious injury in this Commonwealth by an act or omission outside this Commonwealth.[1] The plaintiff maintains that if the tort originates outside the state but the tortfeasor must necessarily know that the injury would occur in the state he has subjected himself to this third basis for jurisdiction, "causing tortious injury by an act or omission in this Commonwealth," referring to the launching of a mortar shell outside Virginia aimed at a place within the Commonwealth and suggesting that unless his construction were adopted there would be no basis for jurisdiction in this Commonwealth. That is the very situation postulated by the annotator of almost exactly the same statute enacted in New York, and in his comments on a New York case, *Feathers* v. *McLucas,* 261 N.Y. Supp. 2d 8, 209 N.E.2d 68 (N.Y. 1965). There a pressure tank sold in Missouri exploded in New York while en route to Vermont and the New York Court held that the tortious act was not committed within the state and New York had no jurisdiction,[2] the Court indicating: "Mere occurrence of the injury in this state certainly cannot serve to transmute an out-of-state tortious act into one committed here, within the sense of the statutory wording." 209 N.E.2d at 77. The commentator said in response to that case:

[1] This section requires additional facts to be proven if the tortfeasor or his agent was not in Virginia when the tort was committed.

[2] The restrictive construction given to subsection 3 by the New York Court in the Feathers case spawned the enactment of the succeeding Section 4 by the New York Legislature, according to Sybron Corp. v. Wetzel, 385 N.E.2d 1055, 1058 (N.Y. 1978). This section was added in 1966. I am puzzled by this statement because Virginia had already enacted that extra Section 4 in its Chapter 333 of the 1964 Acts of Assembly noted at page 539 thereof. This Section 4 appears not only in the New York but also in the Massachusetts statute, Vol. 37 Massachusetts General Laws Annotated, page 220, Chapter 223A, Section 3.

Accordingly, if a New Jersey domiciliary were to lob a bazooka shell across the Hudson River at Grant's Tomb, *Feathers* would appear to bar the New York courts from asserting personal jurisdiction over the New Jersey domiciliary in an action by an injured New York plaintiff. Yet, if the New Jersey domiciliary permitted his son to drive an automobile into the state, New York could acquire personal jurisdiction. . . The sole distinction between the cases is that in the automobile case the defendant has, in person or through an agent, physically entered the state, the factor which *Feathers* found to be of controlling significance. McKinney's Consolidated Laws of New York, Vol. 7B, page 85.

The extremes in views as to whether writing a letter out of the state intending to be read and published in the forum state subjects the letter writer to long-arm jurisdiction is illustrated in a comparison of federal cases in Virginia and the Massachusetts cases cited by the plaintiff, *Murphy* v. *Erwin-Wasey, Inc.*, 460 F.2d 661 (1st Cir. 1972). *Murphy*, in considering the Massachusetts long-arm statute, almost identical with ours, pointed out:

[W]e would be closing our eyes to the realities of modern business practices were we to hold that a corporation subjects itself to the jurisdiction of another state by sending a personal messenger into that state bearing a. . . [message]. . . but not when it follows the more ordinary course of employing the United States Postal Service as its messenger.

On the other hand, the federal courts in Virginia have construed the Virginia statute not to apply to an out-of-state letter writer of an alleged libelous letter directed to a Virginia resident. *St. Clair* v. *Righter*, 250 F. Supp. 148, 151 (W.D. Va. 1966).

A careful consideration of the allegations in the pleadings, coupled with a study of the cases and statutes cited, together with others obtained upon independent research, convinces me that the allegations and proof

of telephone calls and letters alone in this case would not be sufficient to find that Vacation by itself either "acted in the Commonwealth" under § 8.01-328.1(A)(3) or "transacted any business in this Commonwealth" under Section 8.01-328.1(A)(1).

However, I believe that if the plaintiff can establish a conspiracy between Bunning and Vacation to breach Bunning's contract by acts of disloyalty in soliciting fellow employees to transfer to Vacation, Vacation has acted in Virginia through its agent, Bunning, a co-conspirator. Even with the restrictive approach New York has taken to this statute, one of its courts subjected an out-of-state defendant to New York jurisdiction where a fraudulent conveyance of New York property was arranged outside the state upon the theory that the New York grantor was acting as agent for the non-resident grantee, in the following language:

> A trier of the facts could find that the defendant Perez conspired with her brother to effect fraudulent conveyances, that he acted as her agent in preparing and recording the mortgages and in the payment to her in satisfaction of the mortgages, and that those acts therefore constituted tortious acts in New York. *Neilson v. Sal Martorano, Inc.*, 319 N.Y. Supp. 2d 480, 481 (S.C. App. Div. 1971).

In my opinion, even if North Fork could not establish that Broderick had been employed by Vacation prior to March 14th when he arranged for the meetings in Illinois with the other salesmen, the allegations in the pleadings and the evidence taken in discovery are sufficient to indicate that Broderick and Vacation may well have been involved in a conspiracy to induce Bunning to breach his contract with North Fork. This is not to be taken as a holding that such a conspiracy has been established but merely that there is sufficient evidence to establish a *prima facie* case requiring Vacation to defend itself upon the merits in Virginia. The plaintiff need not prove the entire case but only make a "*prima facie*" showing of the conspiracy. *United States* v. *Montreal Trust Co.*, 358 F.2d 239, 242 (2d Cir. 1966); *Ghazonl* v. *International Management Services, Inc.*, 398 F. Supp. 307 (S.D. N.Y. 1975); *cf. Lehigh Valley Industries, Inc.* v. *Birenbaum*,

389 F. Supp. 798 (S.D. N.Y. 1975); *Socialist Workers Party v. Attorney General of United States,* 375 F. Supp. 318 (S.D. N.Y. 1974); *Baldridge v. McPike, Inc.,* 466 F.2d 65 (10th Cir. 1972); *Clark v. United States,* 481 F. Supp. 1086 (S.D. N.Y. 1980).

We must now determine whether this statutory construction transgresses the constitutional rights of Vacation. Even under the recent trend of restrictive constructions of state court jurisdiction of the United States Supreme Court, discussed at 69 Va. L. Rev. 85, *et seq.,* the defendant does seem to have purposefully affiliated himself with Virginia (*id.,* at 87, 107) and to quote Mr. Justice White in *World-Wide Volkswagen Corp.* v. *Woodson,* 444 U.S. 286, 62 L. Ed. 2d 440 (1980): "The defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *Id.,* at 297, 501. *See also Kulko* v. *Superior Court,* 436 U.S. 84 (1978), and *Rush* v. *Sabchuk,* 444 U.S. 320 (1980), for other descriptive Supreme Court interpretations of jurisdiction. It seems to me that if this defendant knew that a contract existed in Virginia between two Virginia residents and it maliciously interfered in the performance of that contract by correspondence and telephone calls to Virginia, its conduct and connection with Virginia are such that it ought reasonably to assume that it would be sued in Virginia for that alleged interference with a Virginia contract.

The motion to quash the service of process must therefore be denied.

The Court must also rule upon the demurrers filed by the defendants. They have been charged with conspiracy to intentionally interfere with the employment contracts of salesmen of North Fork, which also encompassed a breach of Broderick's fiduciary duties of loyalty to his then employer, North Fork. The ground are that no action lies for interference with contracts which are terminable at will (as these all concededly are) and that there is no cause of action in Virginia for unjustified interference with an employer's business relations with his employees. They will be dealt with in that order.

**(A)** *Tortious Interference with a Contract Terminable at Will.*

Both parties recognize that to give rise to a cause of action there must be some sort of "improper" or "malicious" interference with an "at will" contract as distinguished from a contract for a term, *Chaves v. Johnson,* 230 Va. 112, 121 (1985); *Heckler Chevrolet, Inc. v. General Motors,* 230 Va. 397 (1985): "neither is it unlawful to entice an employee of a competitor to leave his employment *provided no wrongful means are used,* and the employment is terminable at will." *Id.,* at 402. (Emphasis added.) As *Chaves* puts it: "Some jurisdictions have held that a competitor is justified by economic self-interest in causing a third person. . . not to continue an existing contract terminable at will provided no 'intentional improper interference' is used, *cf. Allen Realty Corp. v. Halbert,* 227 Va. 441, 449, 318 S.E.2d 592, 597 (1984)" (an interference with prospective contract case). *Glass v. Glass,* 228 Va. 39, 51-52 (1984), quotes another case describing the requisite "bad act" as "intentional misconduct." The *First Restatement of Torts* described it as "purposely causes" the non-performance of a contract, *Restatement of Torts Second* changed it to "intentionally and improperly causes." *Restatement of Torts* 2d, § 766.

There seems little doubt that the pleadings would state a cause of action for breach of loyalty against Bunning, who was North Fork's sales manager, if he was a common law employee and contacted some of its sales staff while both were still employed by North Fork, seeking to induce them to leave North Fork's sales staff and join that of Vacation. *ABC National Transport, Inc. v. Aeronautics Forwarders, Inc.,* 413 N.E.2d 1299 (Ill. App. 1980); *American Republic Insurance Co. v. Union Fidelity Insurance Co.,* 470 F.2d 820 (9th Cir. 1972); *Lowndes Products v. Brower,* 191 S.E.2d 761 (S.C. 1972); *Bancroft-Whitney Company v. Glen,* 411 P.2d 921, 24 A.L.R. 3d 795 (Cal. 1966); *C-E-I-R, Inc. v. Computer Dynamics Corp.,* 183 A.2d 374 (Md. 1962); *Barden Cream & Milk Co. v. Mooney,* 26 N.E.2d 324 (Mass. 1940); *Duane Jones Co. v. Burke,* 117 N.E.2d 237 (N.Y. 1954); *A. S. Rampell v. Hyster Co.,* 144 N.E.2d 371 (N.Y. 1957); *Frederick Chusid & Co. v. Marshall Leeman & Co.,* 279 F. Supp. 913 (D.C. N.Y. 1968); *Hooker, C & M Co. v. Hooker,* 92 A. 443 (Vt. 1914); *see*

*also Restatement* 2d *Agency,* § 393, comment e.[3] That duty of loyalty remains until the employee *leaves* the employment. *Community Counselling Service, Inc.* v. *Reilly,* 317 F.2d 239 (4th Cir. 1963); *Hayes* at 482.

All these cases held that solicitation by an employee of other employees, all employed "at will," to leave the employer and join a competitor constituted a violation of his fiduciary duty and is actionable. The only remaining question in this case is whether Bunning's status as "independent contractor" changes the rule. This cannot be ruled upon here because the pleadings allege an "employment contract" between North Fork and Bunning, but if the evidence develops that the relationship is actually one of independent contractor, the ruling may be different. These remarks also apply to the relationship of the salesmen to North Fork. I suggest counsel brief this if it is to be an issue.[4]

Vacation has no such fiduciary duty but if it conspired with Bunning to entice those employees away from North Fork during Bunning's tenure with North Fork I believe it would be jointly liable with him. *Lowndes Products, Inc.* v. *Brower, supra; A. S. Rampell, Inc.* v. *Hyster Co., supra; Barden Cream & Milk, supra; C-E-I-R, Inc., supra; Bancroft-Whitney Co., supra; Hayes* v. *Schweickart's Upholstery Co.,* 402 S.W.2d 472 (Tenn. App. 1965); cf. *Motorola, Inc.* v. *Fairchild Camera and Instrument Corp.,* 366 F. Supp. 1173 (D.C. Ariz. 1973) (where there was an exodus of employees following the resignation of their leader but *no* evidence of any conspiracy or

---

[3] Electrolux Corporation v. Lawson, 654 P.2d 340 (Col. C.A. Div. II 1982), seems to the contrary and points out that, "Employee resignations do not constitute a breach of their employment contracts. . . where terminable at will." Id., at 341. Colorado apparently holds that soliciting fellow employees to work for a competitor while still employed does not violate a fiduciary duty. I believe Virginia would follow the vast majority and hold otherwise. Also, no conspiracy between the alleged disloyal employee and the competitor was charged in Electrolux.

[4] On this subject see Architectural Manufacturing Co. v. Aerotec, Inc., 166 S.E.2d 744, 746 (Ga. 1969), citing a number of cases in support of the statement, "The same situation [termination of "at will" employer-employee contract by malicious and wrongful interference actionable] exists where the at-will relationship is not technically one of master and servant but of a manufacturer or distributor and sales representatives who are in fact independent contractors."

even encouragement by the lead employee or his new company to those employees to leave). In each of these other cases the competitor or third party was held liable when it combined with one "at will" employee to entice other employees to terminate their "at will" contracts and join its organization. Various theories were used:

Conspiracy: *Hayes* at 481; *A. S. Rampell, Inc.* at 374 and 377, *et seq.*

Procuring employee to breach his contract of loyalty: *Lowndes* at 769.

Unfair competition: *Bancroft-Whitney Co.* at 817; used the confidential information gathered by disloyal departing employee, *C-E-I-R* at 380.

Joinder in a tort with the disloyal employee: *Barden Cream & Milk* at 325. One case held that where a third party deals with an agent knowing that the agent is acting in violation of his fiduciary duty to the principal, the third party is jointly liable with the agent for damages occasioned to the principal. *Martin Co.* v. *Commercial Chemists, Inc.*, 213 So. 2d 477 (Fla. Dist. Ct. App. 1968).

While *Worrie* v. *Boze*, 198 Va. 533, 540 (1957), only held both parties jointly and severally liable for "conspir[ing] to induce the breach of a contract," one of them had with the plaintiff, I believe its rationale would extend to the wrongful inducement of the voluntary termination of an "at will" contract because, "[T]he basis of the action is the wrong which is done pursuant to the conspiracy and results in damage to the plaintiff. *Gallop* v. *Sharp*, 179 Va. 335 (1942)." *Ibid.*

(B) *Unjustified Interference in Virginia with Employer-Employee Relationship.*

No Virginia cases are cited by either party on this. I believe the authorities in other jurisdictions support such an action.

For the foregoing reasons the Court overrules the demurrers filed by the defendants.